# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | | |
|---|---|---|
| SYLVIA L. HINTON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 2:11cv0085 JAR** |
| | ) | **TCM** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Sylvia L. Hinton (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB in November 2009, alleging a disability as of August 26, 2008, caused by back problems, endometriosis, and depression. (R.[1] at 94-110.) Her application was denied initially and after a hearing held in November 2010 before

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Administrative Law Judge (ALJ) Kim D. Parrish. (Id. at 7-24, 29-55, 240.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Barbara Myers, M.S., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then fifty-one years old and has completed the seventh grade. (Id. at 32.) She has not attained a General Equivalency Degree (GED). (Id.)

Plaintiff has not worked since August 26, 2008, and relies on her husband for support. (Id.) Her last job was cleaning for Purina Mill. (Id. at 33.) Asked if she had been experiencing any problems before she left that job, Plaintiff replied that she had had "lots of problems" with her hips and the back of her legs. (Id.) She can not stoop, stand by herself, or mop without pain. (Id.) Because of her problems, her doctor, Dr. Kinkade,[2] told her "he was taking [her] off [work] until further notice." (Id.) Her condition has worsened since she stopped working. (Id.) Her left leg has been going numb. (Id.) She is to have another magnetic resonance imaging (MRI) done of the leg. (Id. at 34.) Also, her right leg tingles and hurts, although it does not go numb like the left leg does. (Id. at 35.) She is not steady on her feet. (Id.) She tries to do some cleaning around her house, but primarily lies down. (Id.) She lies down for eight to nine hours a day. (Id. at 36.) Because she gets dizzy, she is afraid to do anything by herself. (Id. at 35.) The dizziness has been occurring for the past

---

[2]The doctor's name was misspelled in the transcript; the Court will use the correct spelling.

- 2 -

several years.  (Id.)  She has been told it could be caused by allergies or ear problems.  (Id.)

Plaintiff testified that she is never without pain.  (Id. at 36.)  She can stand for approximately ten minutes when doing dishes.  (Id.)  She cannot walk farther than one block, or longer than five minutes, before having to sit down.  (Id.)  She drives an average of once a week.  (Id. at 37.)  Her husband does the grocery shopping.  (Id. at 37, 43.)  She tries to do some housework, but needs help with vacuuming and anything other than dusting.  (Id. at 37-38.)  Her husband also does most of the cooking.  (Id. at 38.)  She used to enjoy fishing, but has not been able to do any in the past few years.  (Id.)

Asked to describe a typical day, Plaintiff summed it up as "[h]orrible."  (Id. at 39.)  After she gets up in the morning, she has a cup of coffee, tries to dust, and then has to rest the remainder of the day.  (Id.)  She does not watch television, read, or listen to the radio or to music.  (Id.)  She lies on the sofa and "glance[s] out [her] patio doors."  (Id. at 39-40.)  The longest she engages in any activity during the day is approximately thirty minutes in total and ten minutes at any one time.  (Id. at 41.)  The heaviest item she lifts is her dog, which weighs approximately ten pounds.  (Id.)  It hurts if she bends forward from the waist; if she stoops to pick up something, she needs help standing up.  (Id. at 41-42.)  She can dress herself, although her husband has to help her in and out of the tub.  (Id. at 42.)  She goes to church on Sundays; however, it is uncomfortable for her to sit through Mass.  (Id.)  She visits with family only on Thanksgiving; she does not visit with friends.  (Id.)  She does not sleep well,

but does not know why. (Id.) She does not go out in the yard; she does water her houseplants every week. (Id. at 43.)

After clarifying that Plaintiff's self-employment income was derived from working as a housekeeper in a nursing home and then in a hotel, the VE classified her past work as a housekeeper as light and unskilled; as a nursing home cleaner as medium and unskilled; as an ice cream server as light and unskilled; and as a packer as medium and unskilled. (Id. at 46.)

The ALJ asked the VE whether Plaintiff's past work could be performed by a hypothetical claimant age forty-nine at the alleged date of onset, with a seventh grade education, and capable of performing the full range of light work[3] but limited to occasional stooping, kneeling, and crouching. (Id. at 47.) The VE replied that Plaintiff's past work as a housekeeper and ice cream server would be available. (Id.) Other unskilled, available work was as a cashier, a counter clerk, and a retail marker. (Id.) These jobs exist in significant numbers in the state and local economies. (Id.)

If, due to fatigue and chronic pain, this hypothetical person could not perform work activities on a regular and continuing basis eight hours a day, five days a week, and consistently would need to rest or recline two or three hours a day, there was no work available. (Id.)

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, and records from various health care providers.

When applying for DIB, Plaintiff completed a Disability Report, listing her height as 5 feet 5 inches and her weight as 140 pounds. (Id. at 118-26.) She is unable to work due to back problems, endometriosis, and depression. (Id. at 119.) These impairments cause "[a]lmost constant pain" in her back and legs, anxiety attacks several times a week, and stomach pain. (Id.) They first interfered with her ability to work several years earlier and stopped her from working on August 26, 2008. (Id.) She answered "Yes" to the question whether she was still working. (Id.) She was currently working as a cook and as a housekeeper at a food mill. (Id. at 120.) The job she had held the longest was working as a housekeeper for a nursing home. (Id.) She had also worked as a night manager for a Diary Queen. (Id.) Her current medications included acetaminophen and hydrocodone with APAP[4] for pain; citalopram and sertraline for depression; Klonopin for anxiety; lovastatin for high cholesterol; zolpidem to help her sleep; cyclobenzaprine as a muscle relaxer; and cetirizine for sinus problems. (Id. at 124.) All but the acetaminophen had been prescribed by health care providers at the Montgomery City Medical Clinic. (Id.) None of her

---

[4]Hydrocodone with APAP is a combination of hydrocodone, a narcotic pain reliever, and acetaminophen (APAP is an abbreviation for acetaminophen), a pain reliever that increases the effects of the hydrocodone; this combination is prescribed for the relief of moderate to severe pain. See Drugs.com, http://www.drugs.com/search.php?searchterm=hydrocodone+with+APAP (last visited Jan. 15, 2013).

medications had any side effects.  (Id.)  She completed the seventh grade, and had not been in special education classes.  (Id. at 125.)

Asked to describe on a Function Report what she did from the time she awoke until going to bed, Plaintiff reported that she went to work, came home, cleaned the house "a bit," and sat around.  (Id. at 144.)  She did not like being around people or talking over the telephone; she preferred to be by herself.  (Id.)  Her husband took care of himself and their pets; he also did most of the cooking.  (Id. at 145, 146.)  She did not sleep well.  (Id. at 145.)  She stayed in her pajamas most of the time, bathed every other day, and sometimes needed to be reminded to take her medications.  (Id. at 145-46.)  The only food she prepared was canned.  (Id. at 146.)  Supper took her thirty minutes to prepare.  (Id.)  She cleaned the house and did the laundry when she had to; these tasks sometimes took all day.  (Id.)  She drove a car, and went shopping once a month for groceries and to pick up medication.  (Id. at 147.)  She used to enjoy fishing with her husband and going to yard sales; she no longer went fishing and seldom went to a yard sale.  (Id. at 148.)  She went to church twice a month, but came home after the service.  (Id.)  She has problems getting along with other people and does not engage any longer in social activities.  (Id. at 149.)  Her impairments adversely affect her abilities to lift, squat, bend, reach, kneel, climb stairs, remember, concentrate, and get along with others.  (Id. at 149.)  They do not affect her abilities to stand, walk, sit, complete tasks, understand, or follow instructions.  (Id.)  She cannot, however, walk every far or finish what she starts.  (Id.)  She gets along okay with authority figures if necessary.  (Id. at 150.)  She does not handle stress or changes in routine well.  (Id.)  She has been fired

or laid off from a job because of problems getting along with other people. (Id.) Specifically, she tells people what she thinks and does not care if this makes them mad. (Id.) She tries to stay by herself. (Id.)

A friend of Plaintiff's completed a Function Report: Adult – Third Party on her behalf. (Id. at 127-33.) He has known Plaintiff for approximately twenty-five years. (Id. at 127.) He visits her and her family often, but Plaintiff does not say much or stay in the same room for long. (Id.) To the best of his knowledge, she stays home most of the time, prefers to be alone, and cries a lot. (Id.) She tried to work four hours a day, but cried at work and was unfriendly. (Id.) Her husband takes care of himself and "does what need[s] to be done." (Id. at 128.) Before her impairments, Plaintiff worked one full-time job and a part-time job, did all the housework, and visited people when she had the time. (Id.) She has trouble going to and staying asleep. (Id.) She used to cook all the meals, but now only prepares her own snacks and sandwiches. (Id. at 129.) Occasionally, she tries to clean the house and do the laundry. (Id.) She used to enjoy fishing, but no longer does. (Id. at 131.) She goes to church once or twice a month, but used to go on a regular basis. (Id.) She is hot-tempered. (Id. at 131, 132.) He assessed the affect of her impairments similarly to Plaintiff's assessment, with the exception of finding that there is no adverse affect on her ability to reach. (Id. at 132.) He does not know how well she follows instructions. (Id.) At times, she seems to have trouble paying attention. (Id.) She does not handle stress or changes in routine well. (Id. at 133.)

Plaintiff also completed a Missouri Supplemental Questionnaire. (<u>Id.</u> at 152-54.) She was then working at Purina Mills as a cleaner. (<u>Id.</u> at 152.) She played video games, did puzzles, or used a computer for an hour at a time at the longest. (<u>Id.</u> at 153.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application. (<u>Id.</u> at 157-64.) Since she completed the initial report, she had begun seeing a psychiatrist and a therapist. (<u>Id.</u> at 158.) She tries to work a few hours each day, but has to sit and stop after ten to fifteen minutes. (<u>Id.</u>) She is unable to sleep due to depression and pain in her legs, hips, and back. (<u>Id.</u>) These changes had occurred in January 2009. (<u>Id.</u>) Her current medications include cetirizine for allergies; citalopram for anxiety; estradiol and Vagifem for hormonal problems; ibuprofen for pain; lorazepam for sleep; lovastatin for high cholesterol; and trazodone for depression. (<u>Id.</u> at 161.) She did not know of any side effects of any of the medications. (<u>Id.</u>)

Plaintiff had reportable annual earnings between 1990 and 2009, inclusive. (<u>Id.</u> at 104.) Her highest earnings were $12,161, in 2001; her lowest were $1,308, in 1991. (<u>Id.</u>) In only six of the twenty years did her annual income exceed $10,000. (<u>Id.</u>) In eleven years, it did not exceed $5,000. (<u>Id.</u>) In 2008, she had reported annual earnings of $10,357.17 – her second highest earnings. (<u>Id.</u>) In September 2008, she disclosed on a Work Activity Report – Employee form that she was working six hours a week as a cook for a county jail. (<u>Id.</u> at 109-14.) It was noted that this did not constitute substantial gainful activity. (<u>Id.</u> at 114.)

The medical records before the ALJ begin in 2006 when Plaintiff consulted Kathleen M. Weaver, M.D., in November leg cramps, body aches, insomnia, and pain in her right great toe and hip. (Id. at 180, 282-85, 286.) It was noted that she smoked eight cigarettes a day and had done so for twenty years. (Id. at 180, 286.) After examining Plaintiff, Dr. Weaver diagnosed her with probable inflammatory disease exacerbated by tobacco; posterior tibial tendonitis; hallux rigidis,[5] osteoporosis; possible rheumatoid arthritis; and a mild leg length discrepancy. (Id.) X-rays revealed "a significant hallux valgus [bunion] and a hallux rigidus with bunion deformity" on her right foot and "mostly hallux rigidis on the left, but a less of a deformity." (Id.) Plaintiff was to use a CAM (controlled ankle motion) walker with arch support, start a back exercise program, undergo some lab tests, and return in two weeks. (Id.) Following the results of those tests, Plaintiff was prescribed Vitamin D. (Id. at 282-85.) A bone density scan on December 7 revealed a density of -1.28 in her hips and -1.95 in her lumbar spine, placing both values at the low end of the range for osteopenia.[6] (Id. at 174.)

Five days later, Plaintiff returned to Dr. Weaver, reporting that her foot pain had improved. (Id. at 179, 286.) She was told that the lab work was negative for any rheumatoid arthritis or inflammatory process. (Id.) She was advised to take calcium supplements. (Id.)

---

[5]Hallux rigidus is osteoarthritis of the first metatarsophalangeal (big toe) joint and "is extremely common." Merck Manual of Diagnosis and Therapy, 1376 (16th ed. 1992) (Merck Manual).

[6]A score between -1 and -2.5 is a sign of osteopenia, "a condition in which bone density is below normal and may lead to osteoporosis." Mayo Clinic, Bone density test, http://www.mayoclinic.com/health/bone-density-test (last visited Jan. 15, 2013).

Also on that day, Dr. Weaver wrote Plaintiff a note that Plaintiff was unable to work from December 6 to the 9th.  (Id. at 168.)

To investigate Plaintiff's complaints of right shoulder and arm pain and leg pain, motor, sensory, and F-wave nerve studies and an electromyogram (EMG) were performed on December 19.  (Id. at 171-72, 274-75.)  They revealed right carpal tunnel syndrome and mild sensory neuropathy of demyelinating type.[7]  (Id. at 172, 75.)  A bone scan performed on December 29 was normal.  (Id. at 170.)

Dr. Weaver discussed Plaintiff's carpal tunnel syndrome and sensory demyelination process with her on January 5, 2007.  (Id. at 178.)  She noted that Plaintiff looked fatigued and that the swelling and tenderness in her right foot had improved, but had not resolved. (Id.)  She also discussed with Plaintiff the need for a formal neurologic evaluation to determine why her myelin status was decreasing and if there was a neurological basis for her fatigue.  (Id.)  Plaintiff was to start on aggressive physical therapy and to continue using the CAM walker.  (Id.)  She was encouraged to stop smoking.  (Id.)

Plaintiff consulted Sudhir Batchu, M.D., on January 30 for a further evaluation of her demyelinating neuropathy.  (Id. at 265-72.)  She reported cramping and pain in her legs for several years that had worsened in the past two years and were worse at night.  (Id. at 268.)

---

[7]A demyelinating condition is one "that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in [one's] brain and spinal cord.  When the myelin sheath is damaged, nerve impulses slow or even stop, causing neurological problems."  Jerry W. Swanson, M.D., Demyelinating disease:  What causes it?, http://www.mayoclinic.com/health/demyelinating-disease/AN00564 (last visited Jan. 15, 2013). "Multiple sclerosis . . . is the most common demyelinating disease."  Id.

She had not been able to sleep well for several years. (Id.) She worked as a night manager at a Dairy Queen, and smoked approximately six cigarettes a day. (Id.) She was then taking Lexapro (citalopram), Lipitor (for treatment of hyperlipidemia), and Xanax (for treatment of anxiety disorders). (Id.) She rated her pain as a six on a ten-point scale. (Id.) On examination, she was alert, oriented to time, place, and person, and had a "slightly depressed" mood and normal affect. (Id. at 269.) She had a decreased sensation to pinprick in the legs below the knees and an "[i]mpaired position sense in bilateral lower extremities." (Id.) The sensation in her upper extremities was normal, as was her gait. (Id.) She had intact coordination in all four extremities. (Id.) Dr. Batchu's impression was of peripheral neuropathy and possible restless leg syndrome, in addition to the previously-diagnosed right carpal tunnel syndrome. (Id.) She was to have a lab work-up for the neuropathy. (Id.) The lab work-up was subsequently cancelled after an accident closed the lab. (Id. at 276-81.)

Plaintiff reported to Dr. Weaver on February 5 that her right foot and toe had not improved, although her sacroiliac joint was "somewhat improved." (Id. at 177.) She did not have any swelling over the medial malleolar region, but did "have significant tenderness along just inferior to the medial malleolar area along the posterior tibial tendon." (Id.) She was also tender over the right great toe and had "a significant hallux rigidis." (Id.) Dr. Weaver informed her that some surgical procedures were not available unless she quit smoking. (Id.) She was to have an MRI of her right lower extremity, which she did two weeks later and which revealed joint effusion and a tear of her anterior talofibular ligament, but no evidence of bone contusion or fracture. (Id. at 169, 177, 187.) Dr. Weaver's

impression was of a ligament tear non-responsive to conservative care. (Id. at 176.) Plaintiff was again cautioned that surgical intervention was not warranted until she quit smoking. (Id.) Plaintiff was to continue a home exercise program and return in one month. (Id.)

In April, an MRI of Plaintiff's abdomen and pelvis was performed to investigate her complaints of nausea, vomiting, and abdominal pain for three weeks and of diarrhea for two weeks. (Id. at 185-86.) It was revealed that she had a septated cyst of the liver, a small cyst adjacent to gallbladder, small cysts in both ovaries, sigmoid diverticulosis,[8] and a small hepatic cyst. (Id.)

A September MRI of Plaintiff's right shoulder revealed a "small focal tear at the distal insertion of the supraspinatus without significant retraction" and "tendinosis through the supraspinatus musculotendinous region." (Id. at 239.)

Ten months later, in July 2008, Plaintiff saw a health care provider at the Montgomery City Medical Clinic (MCMC) about occasional abdominal pain for the past three days and nausea after eating. (Id. at 237.) She reported experiencing hot and cold flashes and having a family history of gallbladder attacks. (Id.) She was referred to the emergency room. (Id.) The following week, she returned to MCMC. (Id. at 236.) Her abdominal pain was an eight

---

[8]Sigmoid diverticulosis is the presence of bulging pockets of tissue, or sacs, that push out from the walls of the left colon, or sigmoid. MedicineNet.com, Diverticulitis, http://www.medicinenet.com/diverticulosis/article.htm (last visited Jan. 15, 2013).

on a ten-point scale.  She was prescribed Vicodin[9]; a prescription for Darvocet[10] was discontinued  (Id. at 235, 236.)

On August 27, Plaintiff reported to a health care provider at MCMC that she still had abdominal pain; however, she rated it as a zero on a ten-point scale.  (Id. at 234.)  She complained of increased depression and decreased sleep.  (Id.)  She was prescribed Vicodin and clonazepam[11] and was to return in one month.  (Id.)

In September, Plaintiff underwent a diagnostic laparoscopy to investigate the cause of her complaints of pelvic pain.  (Id. at 188-94, 221-27.)  The laparoscopy revealed endometriosis, uterine leiomyomata, and pelvic adhesions.  (Id. at 192.)  Consequently, two weeks later, Plaintiff had an abdominal hysterectomy and, at her request, an appendectomy. (Id. at 195-204, 208, 211-20, 23.)  She reported one week later that she felt "fine."  (Id. at 207.)

When Plaintiff returned to MCMC in October, it was noted that she was not depressed or anxious.  (Id. at 232.)

---

[9]Vicodin, a combination of hydrocodone (a semisynthetic narcotic analgesic) and acetaminophen, is prescribed for the relief of moderate to moderately severe pain.  Physicians' Desk Reference, 575 (65th ed. 2011) (PDR).

[10]Darvocet is a combination of propoxyphene, a narcotic pain reliever, and acetaminophen. Drugs.com, Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Jan. 15, 2013).  It was withdrawn from the United States market in November 2010.  Id.

[11]Clonazepam is the generic form of Klonopin, see page 5, supra.  mediLexicon, Clonazepam,  http://www.medilexicon.com/drugsearch.php?s=clonazepam (last visited Jan. 15, 2013).

Plaintiff was evaluated by a psychiatrist, Fernando Perez, M.D., on January 30, 2009. (Id. at 254-58.) She described herself as depressed and not wanting to be around people or do anything. (Id. at 254.) She would sleep for two hours before being awakened by nightmares. (Id.) She had previously thought of suicide, but did not presently. (Id.) She had been depressed her whole life. (Id. at 255.) She had been raped by her two uncles and three ex-brothers-in-law when she was twelve and thirteen years old. (Id.) She was married the first time when she was seventeen; this was to get away from home. (Id.) Her sister suffered from depression; her husband drank. (Id. at 256.) On examination, she was cooperative, easily engaged, and had a sad affect, good eye contact, and goal-directed thought. (Id.) She did not have delusions or suicidal ideation. (Id.) Her insight was poor; her judgment and motivation were fair. (Id. at 257.) Dr. Perez diagnosed Plaintiff with major depressive disorder, recurrent; dysthymia[12]; and post-traumatic stress disorder (PTSD). (Id.) Her Global Assessment of Functioning (GAF) was 50.[13] (Id. at 258.) He prescribed her Celexa and trazodone, both for depression, and noted a pre-existing prescription for clonazepam. (Id.)

---

[12]Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not . . . ." Stedman's Medical Dictionary, 536 (26th ed. 1995) (Stedman's).

[13]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

Four days later, pursuant to Dr. Perez's referral, Plaintiff was seen by Greg Link, M.S.W., L.C.S.W. (Id. at 292-94.) Plaintiff reported that she "ha[d] been depressed most of her life," but had only been taking medication for the past five years. (Id. at 292.) An older sister's husband, now "ex," and an uncle had begun raping her when she was fourteen years old. (Id.) She had left school in the seventh grade because children were picking on her. (Id.) She suffered from panic attacks and depression. (Id.) She isolated herself, had fluctuating moods, and cried often. (Id.) She drank one and one-half pots of coffee and smoked one-half packs of cigarettes each day. (Id. at 293.) She married at sixteen, divorced at nineteen, and married again – to her current husband – at twenty. (Id.) She preferred to be alone, but attended church every Sunday. (Id.) Her strengths included being easy to talk to. (Id. at 294.) Her current medications included trazodone and citalopram. (Id. at 293.) Mr. Link doubled the dosage of trazodone, stopped the citalopram, and added Lyrica,[14] Xanax, and Cymbalta.[15] (Id.) He rated her GAF, both current and during the past year, as 58.[16] (Id. at 294.) He diagnosed Plaintiff with major depressive disorder, not otherwise specified,[17] and generalized anxiety disorder. (Id.)

---

[14]Lyrica is prescribed for the treatment of neuropathic pain. PDR at 2802.

[15]Cymbalta is prescribed for treatment of major depressive disorder, generalized anxiety disorder, or fibromyalgia. PDR at 1759.

[16]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[17]According to the DSM-IV-TR, each diagnostic class, e.g., depressive disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of

Plaintiff met with Michael Kinkade, M.D., on February 12 to discuss the results of laboratory work done earlier in the month. (<u>Id.</u> at 308-09, 347.) The words "depression" and "anxiety" can be seen in his usually illegible notes. (<u>Id.</u> at 309.)

Two days later, Mr. Link and Plaintiff met and developed an initial treatment plan. (<u>Id.</u> at 295-96.) The estimated date the treatment would be concluded was February 18, 2010. (<u>Id.</u> at 296.) At this session, Plaintiff reported that she was taking Lexapro (a brand name for citalopram) and had been taken off the trazodone. (<u>Id.</u> at 297.) She was having difficulty sleeping. (<u>Id.</u>)

The following month, on March 17, Plaintiff reported that she was doing about the same as before. (<u>Id.</u> at 298-99.) She was very depressed and anxious, was having frequent crying spells, and became upset when remembering "things." (<u>Id.</u> at 298.) Mr. Link suggested writing things down on a calendar. (<u>Id.</u>) Plaintiff did not like to be around people; he stressed how important it was for her to try to be. (<u>Id.</u>) She was not sleeping well at night, but was getting more exercise. (<u>Id.</u>)

Five days later, Plaintiff saw Dr. Perez. (<u>Id.</u> at 259-60.) She reported being "stressed out" and upset by little things. (<u>Id.</u> at 259.) She was crying more, had no energy, and had anxiety attacks and agoraphobia. (<u>Id.</u>) She thought about death, but had no suicidal ideation.

---

four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. <u>Id.</u>

(Id.)  Her daughter had been diagnosed with fibromyalgia, and she thought she might have it also.  (Id.)  She was well-groomed, cooperative, and had good eye contact and a normal mood and affect.  (Id.)  Dr. Perez increased Plaintiff's dosage of trazodone, stopped the Celexa, and added Cymbalta and Lyrica.  (Id.)  He noted that she was attending counseling sessions with Mr. Link.  (Id.)

Plaintiff saw Mr. Link the next day and was described as "coping better" but still not sleeping well.  (Id. at 300-01.)  She rated as a zero on a ten-point scale (a) how she was doing what needed to be done on a day-to-day basis and (b) how well she was dealing with things emotionally.  (Id. at 307.)

Plaintiff returned to Dr. Kinkade on March 27.  (Id. at 310-14, 348.)  She could not sleep, had no energy, was fatigued, had episodes of dizziness, and had headaches.  (Id. at 310.)  An MRI of her brain was conducted to investigate the cause of her dizziness and headaches.  (Id. at 315, 365.)  It revealed bilateral mastoid disease, naval congestion, and several punctate areas of increased signal, which could be related to a demyelinating process such as multiple sclerosis (MS).  (Id.)  Dr. Kinkade referred Plaintiff to a neurologist and an ear, nose, and throat specialist.  (Id. at 317.)

Plaintiff saw Mr. Link again on April 13.  (Id. at 302-03.)  She was "very down" and had "a lot of anxiety."  (Id. at 302.)  She was waiting to find out if she had MS and was, consequently, under a lot of stress.  (Id.)  Her husband's plans to retire were put on hold because they needed his insurance.  (Id.)  She had not worked on the goals previously

discussed, i.e., writing in her journal and visiting her brother, but had gone to a store with her husband. (Id. at 303.) That experience had been "miserable." (Id.)

Plaintiff consulted William Kinney, M.D., with the Missouri Ear, Nose, and Throat Center on April 22 about the dizziness and unsteadiness she had been experiencing in the past few months. (Id. at 241-43.) She appeared to be in no acute distress, was well-nourished, and had normal hearing. (Id. at 241.) In addition to impacted ear wax, which was removed, she had chronic otitis externa.[18] (Id. at 241-42.) She was prescribed a cream to treat the otitis externa and scheduled for a diagnostic test to determine the cause of her dizziness. (Id. at 242.) Following that test, Plaintiff was referred to a neurologist to determine whether the cause was Meniere's disease, benign positional vertigo, or MS. (Id. at 244-245.)

On May 12, Plaintiff reported to Dr. Perez that she had been diagnosed with MS. (Id. at 261-62.) He thought the diagnosis had not been confirmed. (Id. at 261.) She wanted his help with her disability application. (Id.) Her appearance was as before, as were her psychiatric diagnoses. (Id.) She was continued on her current dosages of Cymbalta and trazodone; her dosage of Lyrica was increased. (Id.)

Plaintiff consulted a neurologist, Justine Malone, M.D., on May 15. (Id. at 247-53, 393-99.) He summarized her complaints as follows.

She states that over the past several years, she has had progressively worsening symptoms where she has burning and tingling in her arms and legs as well as diffuse muscle cramping. She is developing difficulty with walking,

---

[18]An infected ear canal, also known as swimmer's ear. Merck's Manual at 2327.

> bending over and lifting.  Her symptoms do seem to be worse at nighttime.
> She reports that her balance is poor.
>
> . . .
>
> She reports dyspnea on exertion, coughing and urinary frequency, some
> tinnitus and depressive tendencies, but no other neurological, constitutional,
> psychiatrical, cardiovascular, pulmonary, gastrointestinal, genitourinary,
> musculoskeletal, immunological, hematological, otolaryngological,
> rheumatological or endocrine [sic].

(Id. at 247, 248, 393, 394.)  On examination, she was alert, oriented, and pleasant with a

"mildly flattened affect." (Id. at 248, 394.) Her gait was antalgic[19]; she favored her right leg.

(Id.)  She had 20/40 visual acuity with correction, full extraocular mobility, and normal-

appearing optic nerves and vessels.  (Id.)  Her motor strength was 5/5 in all four extremities.

(Id.)  Her muscle bulk and tone were normal, and she had no abnormal involuntary

movements.  (Id.)  She had a history of smoking twenty packs of cigarettes a year.  (Id. at

247, 393.)  Dr. Malone opined that she did not have MS and that her symptoms were "most

likely related to her chronic smoking and her hyperlipidemia." (Id. at 248.)  His impression

was of an antalgic and arthritic gait disorder; "[l]ikely osteoarthritis"; hyperlipidemia;

nicotine dependence; depression; and bilateral carpal tunnel syndrome.  (Id.)  He also

thought it possible that she had mild peripheral neuropathy with a small fiber component.

(Id.)  He recommended that she stop smoking, have a peripheral neuropathy laboratory

_____

[19]An antalgic gait is an abnormal gait adopted to minimize or avoid pain.  See
Reference.com, Antalgic Gait, http://www.reference.com/motif/computers/antalgic-gait (last visited
Jan. 15, 2013).

workup, undergo an EMG and nerve conduction study of her arms and right leg, and consider a skin biopsy.  (Id. at 248., 394)

Three days later, Plaintiff again saw Dr. Kinkade and requested a "disability tag."  (Id. at 319, 350.)  A noninvasive arterial evaluation of her lower extremities was normal, as was an MRI of her lumbar spine.  (Id. at 320-21, 366-68.)

On May 20, Plaintiff had another session with Mr. Link.  (Id. at 304-05.)  She continued to be stressed by a possible MS diagnosis.  (Id. at 304.)  Also, two cousins had recently died and her husband was having to work extra hours to pay for all the co-pays she was incurring.  (Id.)  She had gone out once, but preferred to stay at home.  (Id.)  She had not written in her journal, but had visited with her brother for ten minutes.  (Id. at 304-05.)

Six days later, Plaintiff returned to Dr. Malone and was informed that the EMG and nerve condition study showed no evidence of large fiber neuropathy.  (Id. at 246, 400-03.)  A skin biopsy was planned.  (Id.)  She later requested a referral from Dr. Kinkade to another neurologist.  (Id. at 322, 351.)

In June, Plaintiff reported to Dr. Perez that she could not get along with Dr. Malone.  (Id. at 263-64.)  She was going to see another neurologist, Dr. Batchu.  (Id. at 263.)  Dr. Perez was concerned that she was focusing on disability "still very much and that may not help her get better."  (Id.)  Her Cymbalta dosage was increased; her trazodone and Lyrica dosages were not.  (Id.)

The following day, she saw Dr. Batchu, informing him that she had had pain in her back and limbs for awhile but it was getting worse.  (Id. at 289-90.)  He described her mood

as depressed and her affect as flat.  (Id. at 290.)  Her gait was normal.  (Id.)  An MRI of Plaintiff's cervical spine revealed multilevel degenerative changes without any significant narrowing of the spinal canal or neural foramina.  (Id. at 329-30.)  After seeing Plaintiff two weeks later, Dr. Batchu referred her to a rheumatologist.  (Id. at 291.)

On July 1, Plaintiff reported to Mr. Link that she "definitely ha[d] [MS] and fibromyalgia."  (Id. at 306-07.)  Mr. Link opined that the source of Plaintiff's depression was not being able to have a relationship with her daughter and grandchildren, who all lived in Florida.  (Id. at 306.)  He encouraged her to be more assertive with her husband, who he described as "very controlling," or she would "have a very difficult time with depression." (Id.)  She rated how she was doing what needed to be done on a day-to-day basis as a six on a ten-point scale and how well she was dealing with things emotionally as a zero.  (Id. at 307.)

Plaintiff informed Dr. Kinkade on July 8 that Dr. Batchu had said "her blood was too thick" and that this condition could lead to a stroke.  (Id. at 323.)  She was concerned.  (Id.)

Six days later, on Dr. Batchu's referral, Plaintiff was evaluated by Daniel J. Lamothe-Jost, M.D.  (Id. at 336-46.)  She reported having pain in her back, legs, and from her hands to her elbows.  (Id. at 336.)  She also had tingling and numbness in her feet, legs, hands, and arms and swelling in her feet and arms.  (Id.)  She had had these symptoms for approximately two years.  (Id.)  Asked to rate her various activity levels, Plaintiff marked "[w]ithout any difficulty" for only one, i.e., turning faucets off and on.  (Id. at 341.)  "With some difficulty," she could dress herself, walk outdoors on flat ground, lift a full cup or glass to her mouth,

wash and dry her entire body, and get in an out of a car or bus.  (Id.)  "With much difficulty,"

she could get in and out of bed, bend down to pick up something off the floor, and deal with

feeling anxious, nervous, depressed, or blue.  (Id.)  She could not walk two miles, participate

in sports, or get a good night's sleep.  (Id.)  On examination, she was severely limited in her

forward flexion of the lumbar spine to approximately fifteen degrees and was also limited in

lateral flexion and rotation.  (Id. at 345.)  She had a negative antinuclear antibody (ANA)

test.[20]  (Id. at 344.)  Dr. Lamothe-Jost found no evidence of systemic lupus or of rheumatoid

arthritis.  (Id. at 345.)  He planned to send her to physical therapy for her low back pain.  (Id.)

On July 30, Dr. Kinkade referred Plaintiff to a rheumatologist for an evaluation of

whether she had fibromyalgia or arthritis.  (Id. at 324.)

In September, Plaintiff consulted Dr. Kinkade about abdominal problems, including

a loss of appetite, tenderness, and occasional nausea.  (Id. at 352-53.)  A computed

tomography (CT) scan of her abdomen and pelvis revealed several hepatic cysts and mild

diverticular disease, but no other abnormalities.  (Id. at 371.)  A scan of her liver was normal.

(Id. at 372.)

In October, Plaintiff consulted Robert Jackson, D.O., with the Rheumatology Clinic

at Audrain Medical Center.  (Id. at 373-92.)  Plaintiff's pain was concentrated in her

lumbosacral area, hips, and anterior shins.  (Id. at 375.)  She rated her pain as an eight on a

ten-point scale.  (Id. at 387.)  On examination, she had lumbosacral tenderness, lumbar

---

[20]An ANA test is used to help screen for autoimmune disorders.  See Lab Tests Online, ANA, http://labtestsonline.org/understanding/analytes/ana/tab/test (last visited Jan. 16, 2013).

forward flexion to three to four centimeters with forward bending, pain-free straight leg raises when sitting,[21] and no swelling, cyanosis, or clubbing.  (Id. at 375.)  X-rays of her lumbar spine revealed mild osteoarthritic degenerative spurring anteriorly in her lumbar spine and aortic atherosclerosis.  (Id. at 378.)  X-rays of her sacroiliac joints revealed mild degenerative changes.  (Id. at 379.)  A bone density scan indicated osteopenia.  (Id. at 377.)  Dr. Jackson opined that Plaintiff might benefit from restless leg syndrome medications or other fibromyalgia medications, e.g., Cymbalta or Savella.  (Id. at 374.)

At a January 2010 follow-up appointment with Dr. Jackson for chronic diffuse arthralgias, myalgias, and back pain, Plaintiff reported that she was continuing to have "a lot of lower extremity leg pain," particularly at night, which she rated as a nine on a ten-point scale.  (Id. at 415-20.)  Because of knee pain, she had been falling.  (Id. at 419.)  She was prescribed an increased dosage of Cymbalta.  (Id. at 416.)  She was started on intravenous micronutrient infusion therapy and administered Toradol intramuscularly for immediate pain relief.  (Id.)  She was also to take two dosages of clonazepam at bedtime for nocturnal restless leg syndrome.  (Id.)  She was to return in four to six weeks.  (Id. at 417.)

Plaintiff had intravenous micronutrient infusions each week for the next two weeks.  (Id. at 422-27.)  Her joint pain was a nine and her fatigue level was an eight at the first

---

[21]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

session.  (Id. at 423.)  At the second session, her joint pain had increased to a ten and her fatigue to a nine.  (Id. at 426.)

At her February 19 visit to Dr. Jackson, the two infusions were described as being of "partial benefit."  (Id. at 408-14, 428-47.)  Plaintiff reported that the pain in her legs, hips, and back was a ten.  (Id. at 444.)  Dr. Jackson noted that "her entire story of what is going on with her health condition still seems to be somewhat vague and the diagnosis limited."  (Id. at 429.)  He also noted that she had seen Drs. Malone and Batchu.  (Id.)  He described the results of his musculoskeletal examination of Plaintiff:

> Reveals some generalized stiffness in shoulders and low back, hips and knees but no active synovitis.  Deep tendon reflexes are +1 to 2 at the knees, 0-1 at the ankles.  She had bilateral hallux weakness without foot drop.  Motor strength was 5 out of 5 in both lower extremities but less than on the left. There was no clonus tremor or ataxia.  She is able to complete transfers and ambulate without assistance of adaptive aides [sic] although she reports having unstable gait and frequent tendency towards falls at home.

(Id. at 431.)  His impression was of chronic low back pain with hereditary structural abnormality and degenerative arthritis; possible autoimmune disorder; and idiopathic lower extremity weakness and incoordination [sic]."  (Id.)  She was to follow-up in three to four weeks.  (Id.)

When Plaintiff saw Dr. Jackson in March for nerve conduction studies and an examination, she had no joint stiffness or restriction in her range of motion.  (Id. at 404-05, 448-54.)  There was "some mild palpatory tenderness in the lumbosacral area."  (Id. at 449-50.)  She reported "partial yet significant benefit" with the Cymbalta; the prescription was renewed.  (Id. at 449.)  She also reported that the pain in her back and legs was a ten on a ten-

point scale.  (Id. at 454.)  Dr. Jackson noted that Dr. Malone's evaluation was negative for peripheral neuropathy or nerve entrapment syndrome.  (Id. at 449.)  Plaintiff was to return in three months, and did.  (Id. at 450, 455-61.)  On examination, Plaintiff had some "generalized myofascial trigger points of her extremities and lower back consistent with fibromyalgia."  (Id. at 457-58.)  Her motor strength appeared to be normal; however, she reported having "trouble with bending, lifting, squatting and kneeling down on the floor." (Id. at 458.)  Dr. Jackson recommended a comprehensive neurology evaluation.  (Id. at 457.) He also refilled her prescriptions for Neurontin[22] and trazodone and started her on tramadol. (Id. at 458.)

The following month, in July, Plaintiff had an MRI of her brain.  (Id. at 462-68.)  It was noted that she had dizziness, headaches, a new onset of paraesthesia in her left thigh, and a family history of MS.  (Id. at 463.)  The results led to a "moderate concern for demyelinating foci" and indicated an "apparent progression since [sic] the previous study." (Id.)  Further study was recommended.  (Id.)  An MRI of her lumbar spine in August revealed mild anterior degenerative spurring; mild disc desiccation with slight decreased space height at L5-6; mild disc bulges and mild degenerative changes at L5-6; and a minimal circumferential disc bulge at L3-4.  (Id. at 470, 473.)

---

[22]Neurontin, or gabapentin, is prescribed for "a range of neuropathic pain conditions."  See Neurontin (gabapentin), http://www.medilexicon.com/drugs/neurontin_783.php (last visited Jan. 15, 2013).

Also in August, Plaintiff consulted Dr. Kinkade about numbness in her left leg, tingling in her left anterior thigh, and back pain. (Id. at 483, 484.) He noted that she was to have a neurology consultation. (Id. at 483.)

In November, Plaintiff was seen by Myles B. Goble, M.D., for an evaluation of whether she had MS. (Id. at 487-94.) He reviewed the MRI of her brain and found nothing to indicate MS. (Id. at 488.) Noting Plaintiff's report that Dr. Batchu, an MS specialist, had told her she "has 'some form of MS,'" Dr. Goble found the absence of any treatment by Dr. Batchu for MS "odd since Dr. Batchu is never hesitant to treat someone he thinks might have some form of demyelinating disease." (Id. at 487, 488, 497.) Dr. Goble asked Plaintiff about several symptoms common to MS, including vision loss, focal numbness or weakness, and headaches. (Id. at 488.) Plaintiff reported having episodes of bilateral vision loss, usually lasting for thirty minutes and having occurred approximately twenty times in the past. (Id.) She did not have any pain behind her eyes or with movement of her eyes. (Id.) She had numbness and weakness in her left leg and tightness in the left thigh. (Id.) She "note[d] gait disability" for the past month. (Id.) She had shooting pain down her spine and progressively worse urinary and bowel urgency during the past year. (Id.) Sometimes, she had double vision. (Id.) For the past two years, she had severe headaches, worse with movement and unrelieved by either Tylenol or Aleve. (Id.) She had not tried ibuprofen or prescription medication. (Id.) Dr. Goble remarked:

> It came up fairly early in our conversation that the patient is seeking disability and that previous physicians have declined to "stand behind her" in her attempt to gain disability. When I asked her why she could not work she stated that because she has significant low back pain and hip pain that makes

> it difficult for her to work.  She also noted that she has trouble getting up from
> a sitting position due to pain and weakness.

(Id. at 489.)  He noted that the abnormalities seen on the MRI of Plaintiff's brain "could be

from small vessel disease such as that which might be seen in someone who smokes,

diabetes, or even someone with severe headaches."  (Id.)  Plaintiff reported experiencing

symptoms such as blacking out spells, dizzy spells, crying spells, numbness or tingling,

weakness in her legs, shaking in her hands, difficulty walking, difficulty falling and staying

asleep, being depressed and worried, fatigue, and constantly being tense or nervous.  (Id. at

491-92.)  On examination, she was not in acute distress; she was alert and oriented to person,

time, and place; she had intact attention span, concentration, and remote and recent memory;

she had normal muscle tone and bulk in her upper extremities; she possibly had  "mildly

increased" muscle tone in bilaterally on knee raise in her lower extremities; and she had

normal muscle bulk in her lower extremities.  (Id. at 490, 492.)  Dr. Goble described

Plaintiff's station as normal and her gait as "slightly antalgic" but steady.  (Id. at 490, 493.)

He noted that she could transition from sitting to standing without difficulty and, "without

too much difficulty," could walk on her heels and toes and walk in tandem.  (Id.)  A Romberg

sign was absent.[23]  (Id. at 493.)  Dr. Goble declined "to sign disability papers" as he had just

met her and his examination had not shown that she was functionally impaired.  (Id. at 490,

493.)   He noted that it sounded like Plaintiff was "having fairly frequent migraine

headaches," but they did not talk about treatment.  (Id. at 493.)  He recommended that

---

[23]A Romberg sign is present if a person cannot stand with his or her feet together and eyes
closed.  Stedman's at 1384.

Plaintiff talk with her primary care physician or rheumatologist if her grounds for disability her back and hip pain. (<u>Id.</u>) He further recommended that she (a) "undergo a lumbar puncture to try to get ancillary support for diagnosis of [MS]"; (b) undergo a laboratory workup to investigate diseases which might mimic MS; (c) have an MRI of her cervical spine; and (d) return in two to three months. (<u>Id.</u> at 494.)

Dr. Goble explained in a letter written the following month to Plaintiff's counsel that the MRI had been denied by Plaintiff's insurance and not pursued. (<u>Id.</u> at 496.) The lumbar puncture, or cerebrospinal fluid evaluation, was "overall unremarkable," as was the laboratory workup. (<u>Id.</u> at 497.) He declined to make a diagnosis of MS at that time, but noted that the diagnosis had not been ruled out. (<u>Id.</u>) He further noted that even if Plaintiff did have MS, many of his patients with that diagnosis were able to work. (<u>Id.</u>) Based on his examination findings, he could not say that Plaintiff could not or should not work. (<u>Id.</u> at 498.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, the ALJ first found that Plaintiff met the insured status requirements of the Act through June 30, 2012, and had not engaged in substantial gainful activity since her alleged disability onset date of August 26, 2008. (<u>Id.</u> at 10-12.) The ALJ next found that Plaintiff had severe impairments of antalgic gait disorder, osteoarthritis, migraine headaches, and nicotine dependence. (<u>Id.</u> at 12.) She also had a non-severe mental impairment. (<u>Id.</u>) Specifically, she complained of depression to her primary care physician in August 2008, was

prescribed, but did not take, medication, and had a completely normal mental status in October 2008. (Id.) The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.)

Next, the ALJ considered Plaintiff's residual functional capacity (RFC). (Id. at 13-22.) She found Plaintiff had the RFC to perform light work except for being able to only occasionally bend forward at the waist, bend at the knees, and bend downward by bending legs and spine. (Id. at 13.) In arriving at this conclusion, the ALJ considered the medical records, including notations by Dr. Perez that Plaintiff had a normal mood and affect, and Plaintiff's allegations and testimony. (Id. at 13-22.) Plaintiff did not have a loss of gait and station or a lack of gross and fine manipulation. (Id. at 13.) The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms [were] not credible to the extent they [were] inconsistent" with the ALJ's RFC assessment. (Id. at 15.) Detracting from Plaintiff's credibility was the inconsistency between her statements and the objective medical evidence. (Id. at 20-21.) For instance, the ALJ noted that Plaintiff had applied for DIB on the grounds of endometriosis, back problems, and depression. (Id. at 20.) The complaints related to endometriosis had apparently resolved following her abdominal hysterectomy. (Id.) She had made a good recovery from the surgery and had no post-operative complaints. (Id.) Also, there were no complaints to her primary care physician of ongoing musculoskeletal pain. (Id.) She was started on medication for her depression in August 2008 and was reported to have a normal mental status two months later.

- 29 -

(Id.)  And, there was no evidence of any autoimmune disease, nor had any health care provider imposed any permanent restrictions or described any permanent limitations.  (Id. at 21-22.)  She had not complied with her doctors' instructions to stop smoking.  (Id. at 21.)  She "ha[d] not been forthcoming regarding her work ability and at times told doctor's [sic] that she was still working part time."  (Id.)  No treating or examining physician had placed any permanent limitations or restrictions on her ability to perform basic work activities.  (Id. at 22.)

With her RFC, however, Plaintiff could not perform any past relevant work.  (Id.)  With her age, within the category of closely approaching advanced age, her limited education, and her RFC there were jobs that she could perform, as described by the VE.  (Id. at 23.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 24.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment, or combination of impairments, which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). RFC "is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations

omitted).  "'[A] claimant's RFC [is] based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations

and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or by applying the medical-vocational guidelines, **Phillips v. Astrue**, 671 F.3d 699, 702 (8th Cir. 2012).

If the claimant is prevented by her impairment from doing any other work, the ALJ is to find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)). When reviewing the record to determine whether the adverse decision is supported by substantial evidence, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'" **Id.** (quoting Medhaug, 578 F.3d at 813). "'If, after reviewing the record, the [C]ourt finds it is possible to draw to inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred (a) by failing to find she had a severe mental impairment; (b) when assessing her RFC; and (c) when evaluating her credibility.

Severe Mental Impairment. As noted above, "[a] 'severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006)) (second alteration in original). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and

laboratory findings, not only by [the claimant's] statement of symptoms . . . ." **Id.** (quoting 20 C.F.R. § 404.1508) (first alteration in original).  As also noted above, the claimant has the burden of showing than an impairment is severe.  See **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).  Plaintiff argues that the record, including Dr. Perez's diagnosis of major depressive disorder and PTSD, Dr. Batchu's characterization of her mood as depressed and her affect as flat, and her GAF of 50, establish her depression as severe.  Consequently, she further argues, the ALJ should have considered her nonexertional limitations caused by the depression and should have send her for a consultative examination.

The first reference in Plaintiff's medical records to depression is in January 2007, thirty-four months before she applied for DIB and twenty months before her alleged disability onset date.  That reference describes her as "slightly depressed" and with a normal affect.  (See R. at 269.)  The next reference is from the day after her alleged disability onset date and refers to increased depression and decreased sleep. She was prescribed clonazepam.  Two months later, she was neither depressed nor anxious.  Three months later, in January 2009, there is a reference to her being depressed all her life.  The following month, she started seeing a psychiatrist, Dr. Perez, and a therapist, Mr. Link.  When completing a treatment plan in February 2009, Mr. Link anticipated that treatment would be completed in February 2010.  After four sessions with Dr. Perez, Plaintiff stopped seeing him in June 2009.  After seven sessions with Mr. Link, Plaintiff stopped seeing him in July 2009.

Although it is undisputed that Plaintiff suffers from depression, "[d]epression . . . is not necessarily disabling." **Trenary v. Bowen**, 898 F.2d 1361, 1364 (8th Cir. 1990) (finding ALJ

had not erred in concluding that claimant had not suffered from severe depression doing relevant time period regardless of two doctors's findings that she had been depressed at various times).  Plaintiff sought and then stopped treatment for her depression within seven months – seven months before the date Mr. Link anticipated the treatment would be finished.  Such behavior belies claims of debilitating effects of depression lasting the required twelve months.  See, e.g. **Martise**, 641 F.3d at 924 (affirming ALJ's decision that impairment "controllable and amenable to treatment" was not severe); **Banks v. Massanari**, 258 F.3d 820, 826 (8th Cir. 2001) (claim of disabling depression was inconsistent with lack of ongoing treatment for same and with improvement of depression once claimant started taking anti-depressants); **Holland v. Apfel**, 153 F.3d 620, 622 (8th Cir. 1998) (finding claimant not disabled by depression in absence of any ongoing treatment for depression).

The importance of the duration of her treatment for depression when assessing its severity is illustrated by the assessment by the psychiatrist, Dr. Perez, of her GAF as being at the top of the range for serious symptoms, see note 13, supra, followed eight days later by Mr. Link's assessment of her GAF as being 58, close to the top of the range for moderate symptoms.[24]  See **Goff**, 421 F.3d at 791(GAF score of 58, indicative of moderate symptoms, was inconsistent with opinion of treating psychiatrist that claimant's depression was severe).

---

[24]The Court notes that a GAF of 58 is but three points below the range of 61 to 70, which is indicative of "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

Moreover, none of Plaintiff's health care providers, including the psychiatrist and the therapist, imposed any functional limitations on her as a result of her depression.  See, e.g., **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (affirming ALJ's decision at step two that claimant's depression was not severe; supporting that decision were, inter alia, absence of any opinions about claimant's functional limitations accompanying diagnoses of depression by various physicians and reliance for diagnoses  on claimant's own statements); **Davidson v. Astrue**, 578 F.3d 838, 844 (8th Cir. 2009) (affirming ALJ's decision that claimant's major depressive disorder was not disabling given lack of any functional limitations caused by depression that were more than moderate and evidence that depression was controllable with medication).

Also, Plaintiff described her depression as being a life-long condition; however, she had worked for a number of years with the condition.  Indeed, she was apparently working part-time after applying for DIB on the grounds that her depression, among other things, had stopped her from working in August 2008.  See **Goff**, 421 F.3d at 792 (claimant continuing to work with impairments demonstrated that impairments were not disabling).

For the foregoing reasons, the ALJ did not err in not finding Plaintiff's depression to be a severe impairment.[25]

The ALJ's RFC Determination.  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite

---

[25]Because the ALJ did not find the depression to be severe, her failure to perform a psychiatric review technique was harmless error at best.  See **Cuthrell v. Astrue**, No. 12-2329, slip op. at 6 (8th Cir. Jan. 10, 2013).

his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff argues that the ALJ erred in determining her RFC by failing to include additional limitations, including walking, caused by her antalgic gait disorder. The Court disagrees.

Dr. Goble diagnosed Plaintiff with antalgic gait disorder after observing her gait to be "slightly antalgic" but steady and observing her to be able to heel to toe walk and walk in tandem. He did not place any exertional limitations on her. In November 2006, well before her alleged disability onset date, Plaintiff was observed to have a mild discrepancy in her leg lengths. Three months later, her gait was described as normal. In May 2009, her gait was described as antalgic; however, her muscle tone and bulk were normal. One month later, her gait was normal. No health care provider placed any functional limitations on Plaintiff. Indeed, the functional limitations cited by Plaintiff in her supporting brief, e.g., an inability

to stand for longer than ten minutes and to walk longer than five minutes, see Plaintiff's Brief at 20, are based only on her testimony[26] and are not supported by any objective medical evidence. To the contrary, a May 2009 MRI of her lumbar spine was normal and October 2009 x-rays and an August 2010 MRI of the lumbar spine revealed only *mild* osteoarthritic degenerative spurring. Three months after this last MRI, Plaintiff was able to heel to toe walk, walk in tandem, and transition from sitting to standing without difficulty. Following the evaluation in which she was able to do these tasks, Dr. Goble declined to find she had any functional impairments.

An ALJ must base her determination of a claimant's RFC on some medical evidence. **Jones v. Astrue**, 619 F.3d 963, 971 (8th Cir. 2010). In the instant case, the ALJ lacked any medical evidence that Plaintiff had a walking limitation.

Plaintiff further argues, however, that the bending limitation the ALJ did find necessarily implicates a walking limitation. Again, the Court disagrees. There was some medical evidence to support the bending limitation found by the ALJ. Range of motion testing revealed Plaintiff was restricted in her ability to bend at the waist. As discussed above, there is no evidence, aside from Plaintiff's statements, that her antalgic gait caused a walking limitation.

Regardless, Plaintiff contends that the ALJ should have ordered a consultative examination to resolve whether a person with a antalgic gait and bending limitation necessarily has a walking limitation.

---

[26]Plaintiff's challenge to the ALJ's decision about her credibility is addressed below.

Title 20 C.F.R. § 1519a(a) provides that a consultative examination may be ordered if the necessary information may not be obtained from the claimant's medical sources. "'[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" **Freeman v. Apfel**, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)) (alteration in original). If, however, the medical records before the ALJ provide sufficient medical evidence to determine whether the claimant is disabled, a consultative examination is not required. **Martise**, 641 F.3d at 926-27; accord **Johnson v. Astrue**, 627 F.3d 316, 320 (8th Cir. 2010); **Haley v. Massanari**, 258 F.3d 742, 749-50 (8th Cir. 2001).

Plaintiff's Credibility. Citing **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001), Plaintiff correctly notes that an ALJ must be explicit if discrediting a claimant's testimony, give reasons for that decision, and consider the relevant factors. (See page 32, supra.) Accord **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) ("'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'") (quoting Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)). In support of her argument that the ALJ did not do as required, Plaintiff cites the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms [were] not credible to the extent they [were] inconsistent" with the ALJ's RFC assessment. (R. at 15.) This, however, is not all the ALJ wrote. The ALJ proceeded to discuss the various inconsistencies in the record that detracted from Plaintiff's credibility.

One of these inconsistencies is the lack of supporting objective medical evidence. Although "'[a]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them,'" **Renstrom**, 680 F.3d at 1066 (quoting <u>Wiese</u>, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, **id.** at 1065. <u>Accord</u> **Buckner**, 646 F.3d at 558; **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). Plaintiff complained of debilitating pain, yet examination results showed only mild degenerative spurring in her lumbar spine, a gait that was "slightly" antalgic, and muscle tone, bulk, and strength that were routinely normal. Plaintiff complained of debilitating depression, but stopped seeking treatment for such five months short of the twelve months required for an impairment to be disabling.

The ALJ also considered, properly, as a factor detracting from Plaintiff's credibility the lack of any functional restrictions or limitations placed on her by any physician. <u>See</u> **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that none of Teague's doctors reported functional or work related limitations due to [her allegedly disabling impairment], there was a basis to question Teague's credibility."); <u>accord</u> **Dunahoo**, 241 F.3d at 1038 (affirming adverse credibility determination based, in part, on lack of any functional restrictions placed on claimant by her doctors).

Other considerations detracting from Plaintiff's credibility were her failure to stop smoking, as advised to by two doctors, including Dr. Weaver who informed Plaintiff that she would have to do so before she could undergo surgery to address her foot problems, and her

failure to follow the advice of her therapist. See **Renstrom**, 680 F.3d at 1067. See also

**Mouser**, 545 F.3d at 638 (finding that when evaluating claimant's credibility, ALJ properly

considered claimant's failure to stop smoking although repeatedly advised to by doctors).

There were also, as noted by the ALJ, inconsistencies in the record. For instance, Plaintiff

informed her therapist that she was having difficulty with being diagnosed with MS after she

had been told she did not have MS. She stated on a report form that she stopped working on

August 26, 2008, but continued to do so, albeit part-time.

Also detracting from Plaintiff's credibility were the references in the records of (a) Dr.

Perez to Plaintiff wanting his help with her disability application and later to his concern that

her focus on her disability application was interfering with her treatment,[27] and (b) Dr. Goble

to Plaintiff early bringing up the subject of doctors supporting her in her quest for disability

benefits. "[A] claimant's financial motivation may contribute to an adverse credibility

determination when other factors cast doubt upon the claimant's credibility." **Ramirez v.**

**Barnhart**, 292 F.3d 576, 582 n.4 (8th Cir. 2002). See also **Gaddis v. Chater**, 76 F.3d 893,

895-96 (8th Cir. 1996) (finding that ALJ properly discounted credibility of claimant who was

financially motivated to seek disability benefits).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's

conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.

"If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the

---

[27]The Court notes that Plaintiff did not return to Dr. Perez after this visit.

decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of January, 2013.